**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL E. DAVIDSON | Civ. No. 08-3580 (DRD) |
| Plaintiff, | |
| v. | **O P I N I O N** |
| CORRECTIONAL MEDICAL SERVICES, INC., ET AL. | |
| Defendants. | |

*Appearances by:*

MICHAEL E. DAVIDSON
2112 McCabe Avenue
Room 4
Bradley Beach, NJ 07720

> <u>*Pro Se*</u> *Plaintiff*

MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
by: Sean Robins, Esq.
Cooper River West
Suite 300
6981 North Park Drive
Pennsauken, NJ 08109

> *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

This matter comes before the Court on a motion submitted by Defendants Correctional

Medical Services, Inc. ("CMS"), Carl Ausfahl, Catherine O'Donnell, Cheryl Proverbs, Maryjane

Rule, Christopher Seidelhofer, Paul Thomas, John Hochberg, and Herbert Smyzeck (collectively "Defendants") to dismiss Plaintiff Michael E. Davidson's Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The Court previously dismissed two versions of the Plaintiff's Complaint. The first was an impossibly convoluted document consisting of 1345 numbered paragraphs in which Plaintiff, a former prisoner who at the time of the events out of which this suit arises was confined at the Adult Diagnostic and Treatment Center ("ATDC") in Avenel, New Jersey, contended that 17 named and 55 unnamed "John Doe" Defendants had violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution by failing to provide adequate medical care and/or committing medical malpractice. On the basis of those allegations, Plaintiff asserted claims under 42 U.S.C. § 1983 against all Defendants in both their professional and personal capacities. On August 21, 2008, the Court dismissed various portions of that Complaint without prejudice, granting leave to amend and reassert the dismissed claims. In its ruling, the Court included a footnote stating that "any proposed amended complaint "must be complete in itself and may not incorporate any part of the initial prolix Complaint."

Plaintiff filed an Amended Complaint on September 19, 2008. In doing so, he misconstrued the Court's statement in its August 21, 2008 ruling that the Amended Complaint "must be complete in itself" to mean that he was prohibited from including in that pleading any of the allegations set forth in his original Complaint. As a result of that misunderstanding, the Amended Complaint only included allegations of wrongdoing on the part of 16 of the "John Doe" Defendants. The named Defendants were mentioned, but only in relation to allegations against unknown "John Doe" Defendants.

Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6).  On December 4, 2008, the Court granted that motion, holding that the Amended Complaint should be dismissed because it did not refer to any of the named Defendants except in reference to claims asserted against "John Doe" Defendants, and "an action cannot proceed solely against unnamed parties."  Hines v. FDIC, 137 F.3d 148, 159 (3d Cir. 1998).  In light of the fact that his original Complaint had stated a cognizable claim against several Defendants, however, the Court ruled that Plaintiff should be granted leave to amend and reassert his allegations.  In order to facilitate that process, the Court appointed pro bono counsel to represent Plaintiff for the limited purpose of drafting a Second Amended Complaint.

Plaintiff filed his Second Amended Complaint on October 30, 2009.  In lieu of an Answer, Defendants filed the pending Motion to Dismiss.[1]  In their Motion, Defendants contend that the factual allegations contained in Plaintiff's Second Amended Complaint demonstrate that they did not act with deliberate indifference, and Plaintiff has therefore failed to state a claim for violations of his Eighth and Fourteenth Amendment rights.  The Court agrees.  Rather than displaying deliberate indifference, Plaintiff's allegations compel the conclusion that the Defendants attempted, although with mixed success, to treat his medical conditions in keeping with their standard of care under the Eighth and Fourteenth Amendments.  Plaintiff may disagree with the judgments made by the medical personnel by whom he was treated, but that disagreement does not transform their actions into constitutional violations.  Nor does the fact that there were delays in obtaining the surgeries and other procedures provided as part of his care compel the conclusion that Defendants acted with "deliberate indifference" to his medical needs,

---

[1] Two of the Defendants named in the original Complaint and Amended Complaint, Peter DeStefano, M.D. and Saint Francis Medical Center, were not included in the Second Amended Complaint.  The Court entered an Order on December 9, 2009 clarifying that there are no claims pending against those former Defendants and they are no longer a party to this action.

as the delays in this case were relatively brief and appear to have been reasonable in light of Plaintiff's conditions.  Therefore, Plaintiff's Complaint will be dismissed with prejudice.

## I. BACKGROUND

The procedural history of this action and facts relating to Plaintiff's two prior Complaints are laid out comprehensively in the Court's December 12, 2008 Opinion.  For the sake of brevity, the Court incorporates the "background" section of that ruling and will not repeat the facts set forth therein.

Plaintiff's Second Amended Complaint, which is the subject of the pending Motion to Dismiss, asserts claims against 17 named Defendants and 10 unknown "John Doe" Defendants. Plaintiff alleges three violations of his Eighth and Fourteenth Amendment rights to receive reasonable medical care while incarcerated.  First, he claims that Defendants failed to properly diagnose and treat a pre-existing heart condition of which they were aware, thus causing him to suffer a second heart attack.  Additionally, Plaintiff claims that he was repeatedly exposed to secondhand smoke while incarcerated, despite the fact that Defendants knew that such exposure could be harmful in light of his heart condition.  Finally, he claims that he suffered from a painful skin condition while imprisoned, but Defendants refused to treat that malady for a period of two years.  The information on each of Plaintiff's three conditions alleged in his Complaint is set forth below.  Because the Court must assume the veracity of all factual allegations contained in Plaintiff's Complaint when deciding the pending Motion to Dismiss, Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997), the information relating to his conditions included in this ruling has been drawn directly from his Complaint and any contradictory factual assertions on the part of Defendants have not been credited.

## A.  Heart Condition

In 2001, almost five years before he was incarcerated at ATDC, Plaintiff suffered a heart attack.  Shortly thereafter, he underwent an angioplasty surgery to remove blockages from the blood vessels surrounding his heart.  Six months after the first operation, Plaintiff underwent a second angioplasty, but remained vulnerable to heart attacks even after both operations were complete.  (Compl. ¶ 25.)

After being arrested on July 18, 2004 and imprisoned at another facility for the following year and a half, Plaintiff was transferred to ADTC on December 6, 2005.  When he arrived at that facility, Plaintiff alleges that he informed an ADTC nurse of his prior heart attack and surgeries, and stated that he had suffered chest pains during the previous year.  (Compl. ¶ 36.) Later on the same day that he was admitted, Plaintiff was examined by three different doctors at ADTC, including one of the Defendants, Dr. John Hochberg.  He claims that he informed each of those physicians of his heart attack and prior surgeries.  (Compl. ¶¶ 39-40.)  In addition to the aforementioned medical personnel, Bernard Goodwin, the Administrator of ADTC and another Defendant in this action, met with Plaintiff during January or February 2006 in an attempt to address his complaints.  Plaintiff alleges that he informed Mr. Goodwin of his history of heart disease and prior surgeries during that meeting.  (Compl. ¶ 41.)

Following his meeting with Mr. Goodwin, Plaintiff alleges that he was assigned to a work position within the ADTC kitchens that exacerbated his heart condition.  In his Complaint, Plaintiff claims that:

> Mr. Goodwin assigned Plaintiff to a kitchen job, which required Plaintiff to lift approximately 15 heavy crates, load them onto a cart and push them up a ramp to a remote kitchen where they were unloaded for washing. He was required to stack the dishes for washing and eventually carry the dishes to their final location. This caused substantial chest pain, blurred vision, dizziness and shortness of breath.

> Mr. Goodwin did not inform Plaintiff of special job classifications for disabled or physically impaired inmates.

(Compl. ¶ 41.)

Plaintiff remained in that job until July 26, 2006 – a period of five to six months.  (Compl. ¶ 47.) During that time, his heart condition was monitored through a series of examinations carried out by physicians both within and outside ADTC.

After complaining of chest pains in early February 2006 – at most a few weeks after his meeting with Mr. Goodwin and starting his job in the ADTC kitchen, which Plaintiff states that he did in "January or February of 2006" (Compl. ¶ 41) – Plaintiff was examined by Dr. Hochberg and underwent an EKG test to determine whether his heart was functioning normally. On February 5, 2006, Dr. Hochberg reviewed the results of Plaintiff's EKG and noted that he suffered from various heart conditions.  (Compl. ¶ 42.)  The following day, Dr. Hochberg completed another examination, at which he recorded information on Plaintiff's previous heart attack and surgeries.  (Compl. ¶ 43.)

In late April or early May, 2006, ADTC staff transported Plaintiff from that facility to St. Francis Medical Center ("St. Francis") for a consultation with a cardiology specialist.[2] According to Plaintiff, the specialist "indicated that he wanted to repeat the cardiac catheterization" – a test in which a thin tube is inserted through the chest into the heart in order to measure blood pressure and the oxygen content of a patient's blood – "but no procedure was conducted at that time."  (Compl. ¶ 44.)

---

[2] In the two previous iterations of his Complaint, Plaintiff asserted claims against the specialist, Dr. Peter DeStefano, and St. Francis.  As discussed supra at note 1, those claims were not included in Plaintiff's Second Amended Complaint.

Two months later, on July 7, 2006, Plaintiff was examined again by Dr. Hochberg. During that appointment, Plaintiff complained of shortness of breath.  Dr. Hochberg advised him to return for a follow-up examination in three months.[3]  (Compl. ¶ 46.)

On July 26, 2006 – a mere 19 days after his last appointment with Judge Hochberg – Plaintiff complained of severe chest pains while working in the ADTC kitchen.  (Compl. ¶ 47.) ADTC officials removed him from work and later that day he was transferred to St. Francis for evaluation by cardiac specialists.  The physicians at St. Francis noted that he suffered from severe heart conditions that had resulted in irreversible damage to several arteries and had reduced the pumping capacity of his heart to roughly 20-22 percent of normal.  (Compl. ¶ 48.) Based on those conditions, the doctors at St. Francis determined that Plaintiff had "likely suffered a second heart attack."[4]  (Compl. ¶ 48(v) (emphasis omitted).)

While at St. Francis, Plaintiff underwent an emergency angioplasty operation in which six stents – small tubes used to expand a blocked blood vessel – were inserted into his arteries. According to Plaintiff, one of the treating physicians at St. Francis suggested that he receive an automatic implantable cardiac defibrillator ("AICD") – a small device inserted into the chest cavity that automatically shocks the heart muscles using electric current if a patient's heartbeat becomes irregular or stops in order to restore a normal rhythm.  (Compl. ¶ 51.)  Rather than

_____

[3] As the Court held in its August 21, 2008 Opinion dismissing Plaintiff's original Complaint, any claims which arose prior to July 14, 2006 – two years before Plaintiff's Complaint was filed – are barred by New Jersey's two-year statute of limitations on such claims.  See Wilson v. Garcia, 471 U.S. 261, 280 (1985)(stating that civil rights claims are best characterized as personal injury actions and are governed by the applicable state statute of limitations for such actions); N.J. Stat. Ann. § 2A:14-2 (imposing a two-year statute of limitations on personal injury claims).  Because the Court finds that Plaintiff's allegations demonstrate that the Defendants did not act with deliberate indifference, the statute of limitations issue need not be addressed. Plaintiff's factual allegations relating to events prior to July 14, 2006 have been included in this ruling in order to provide context for his claims.

[4] Although Plaintiff's claims presuppose that the alleged second heart attack occurred while he was incarcerated at ADTC and under the care of Defendants, he makes no explicit allegation to that effect in his Complaint.

receiving such a device or being examined by a doctor specializing in similar treatment methods, however, Plaintiff was discharged from St. Francis on the day after his surgery and sent to the infirmary at ADTC.  (Compl. ¶¶ 51-53.)  He remained in the ADTC infirmary for four days, during which time Plaintiff contends he "was experiencing extreme pain" at the site of the incisions for his angioplasty surgery.  (Compl. ¶ 53.)  Thereafter, he was transferred back to his cell.  (Compl. ¶ 54.)

There is some dispute as to whether Plaintiff was scheduled to receive an AICD after his July 26, 2006 emergency angioplasty at St. Francis.  In an October 17, 2006 report, Dr. Hochberg stated that Plaintiff was added to a waiting list at another medical facility, Hamilton Cardiology, to receive such a device as soon as possible.  (Compl. ¶ 59.)  Plaintiff contends that he was "not taken to Hamilton Cardiology or any other hospital at any time," but does not specifically aver in his Complaint that he was not added to the list of individuals that were scheduled to receive AICD's at that facility.  (Compl. ¶ 59.)  It is possible that Plaintiff was added to Hamilton Cardiology's waiting list on the recommendation of treating physicians at St. Francis without ever actually visiting the former facility.

Plaintiff alleges that, after he was discharged from the ADTC infirmary to his cell on July 31, 2006, he was "placed on the top bunk, causing Plaintiff to climb up and down numerous times per day, resulting in great pain."  (Compl. ¶ 56.)  He further asserts that "doing simple ch[ores], such as going to meals, brushing his teeth, or going to appointments, was extremely painful and placed Plaintiff in fear of his life due to possible complications."  (Compl. ¶ 56.)  Plaintiff claims that he filed two complaints protesting his circumstances, the first in August of 2006 and the second on September 17th of that year.  (Compl. ¶¶ 57-58.)  Additionally, Plaintiff

contends that he complained to a nurse working at ADTC, Defendant Cheryl Proverbs, while being examined by her on October 23, 2006.  (Compl. ¶ 60.)

On November 29, 2006, after Plaintiff complained of "significant chest pains," he was transferred to Rahway General Hospital, where he was admitted for observation.  (Compl. ¶ 61.) When his pain did not subside after a day, he was moved to St. Francis and examined by the physicians at that hospital.  (Compl. ¶ 62.)   After learning that one of his arteries was 95 percent blocked, the doctors at St. Francis inserted another stent and once again recommended that Plaintiff receive an AICD.  (Compl. ¶¶ 63-64.)  Plaintiff spent one week at St. Francis, and was transferred back to ADTC on December 5, 2006, where he was placed in the infirmary for one day before being sent back to his cell.  (Compl. ¶ 68.)

On December 7, 2006, Dr. Hochberg reviewed the report from the physicians at St. Francis and indicated that Plaintiff would be scheduled for a follow-up appointment with a cardiac specialist the following month.  (Compl. ¶ 69.)  On January 9, 2007, Plaintiff underwent surgery at St. Francis and received an AICD manufactured by Medtronic, Inc. ("Medtronic").[5] (Compl. ¶ 71.)  Plaintiff alleges that he "awoke several times" during the surgery, and that in each case he was "in extreme pain."  (Compl. ¶ 72.)  Upon returning to ADTC on January 10, 2007, Plaintiff was placed in that facility's infirmary for four days.  (Compl. ¶¶ 73-74.)  On January 14, 2007, he returned to his cell, where he was once again placed on the top bunk. (Compl. ¶ 75.)

Plaintiff alleges that he received a letter from Medtronic on October 22, 2007 stating that the AICD installed in his chest was defective.[6]  (Compl. ¶ 77.)  His Complaint includes no

---

[5] In his Complaint, Plaintiff states that the AICD was manufactured by "Medtronics."  The Court has been unable to confirm the existence of any company by that name, and presumes it is a reference to Medtronic, Inc., a well-known manufacturer of medical devices.
[6] Plaintiff asserts no claims against Medtronic.

information as to the nature of that alleged defect, and does not allege that the AICD was not fit

for its intended purpose.  Plaintiff claims that he filed several complaints regarding the alleged

defects in his AICD during the period between October of 2007 and the following March,

including:

   (1) Two "Health Services Request" forms – the first filed on October 29, 2007
       and the second on January 13 or 14, 2008 – asking that he be allowed to speak
       to a doctor at the ADTC about the device (Compl. ¶¶ 78, 80);

   (2) A letter to Defendant George Haymen, Commissioner of the New Jersey
       Department of Corrections ("NJDOC") sent "on or around January 2008"
       (Compl. ¶ 79);

   (3) A January 31, 2008 letter to Defendant Paul Thomas, Regional Director for
       Defendant CMS (Compl. ¶ 82);

   (4) A "detailed remedy form" filed with ADTC authorities on March 5, 2007
       (Compl. ¶ 87);

   (5) Two letters to Defendant Ralph Woodward, a DOC employee, the first on
       February 22, 2008 and the second on March 17, 2008 (Compl. ¶¶ 86, 90); and

   (6) A March 17, 2008 letter to Defendant Chris Seidelhofer, a CMS employee
       (Compl. ¶ 91.)

It appears that the Defendants attempted to accommodate Plaintiff's requests.  On

January 15, 2008 – shortly after he filed his second "Health Services Request" – Plaintiff was

examined by Dr. Herbert Smyczek, a CMS employee and Defendant in this action.  Plaintiff

alleges that he informed Dr. Smyczek of the defects in his AICD and gave him a copy of the

letter from Medtronic.  (Compl. ¶ 81.)  During a February 19, 2008 consulation, "Nurse

Delores," another CMS employee and Defendant in this case, asked Plaintiff for another copy of

the letter and told him that he would be seen in the ADTC infirmary.  (Compl. ¶ 83.)  The

following day, Plaintiff met with Catherine O'Donnel, who he indicates in his Complaint is the

"Ombudsman" of CMS and who is yet another of the named Defendants.  Ms. O'Donnel,

obviously aware of Plaintiff's complaints, informed him that another Chris Seidelhofer would

meet with him sometime in the next two or three days to discuss possible ways of fixing the defective AICD.  (Compl. ¶ 84.)  It is unclear whether such a meeting took place, as Plaintiff's Complaint does not indicate whether he met with Mr. Seidelhofer or what they discussed.  He does state, however, that he met "again regarding his defective defibrillator" with Mr. Seidelhofer on March 5, 2008.  (Compl. ¶ 89 (emphasis added).)  Thus, it appears that Mr. Seidelhofer and Plaintiff discussed the defective AICD at some point in late February, 2008.

Faced with Plaintiff's barrage of letters, Defendants continued during March and April of 2008 to attempt to address his concerns.  On March 5, 2008, Plaintiff received a letter from Sharon Felton, an employee of the NJDOC, responding to his complaints.  Ms. Felton indicated that she had forwarded Plaintiff's requests to Defendant Roy Calafato, a CMS employee.  (Compl. ¶ 88.)  Nine days later, Plaintiff met with Nurse Delores and Chris Seidelhofer, who requested another copy of the letter from Medtronic.  (Compl. ¶ 89.)  Plaintiff does not indicate whether those individuals proposed any course of action to address the defects in his AICD at that time, but Plaintiff apparently failed or refused to furnish Mr. Seidelhofer with another copy of the letter.  Mr. Seidelhofer made a second request on March 18, 2008.  (Compl. ¶ 92.)  On April 11, 2008, Ms. Felton of the NJDOC replied to the complaints Plaintiff had sent to Mr. Woodward, another employee of that agency, on February 22nd and March 17th of that year.  Ms. Felton stated that she had forwarded Plaintiff's requests to Catherine O'Donnel and that they would be handled by CMS.  (Compl. ¶ 93.)

On April 15, 2008, Plaintiff was taken to St. Francis so that the physicians at that facility could address the defects in his AICD.  Rather than requiring Plaintiff to undergo another invasive surgery – which would have been the fourth operation on his heart – the St. Francis doctors installed an alarm on the device that would emit a beeping sound in the event of

malfunctions.  (Compl. ¶ 94.)  Plaintiff expressed displeasure at that remedy, and apparently remains dissatisfied, as he contends in his Complaint that the Defendants displayed deliberate indifference to his medical needs and intentionally caused him severe emotional distress. (Compl. ¶¶ 141-155.)  Plaintiff included no information as to whether the AIDC continues to function or whether he sought to correct the alleged defects in that device after his release from the ADTC on January 3, 2009.  It appears, however, that he has not suffered further heart attacks or required additional surgeries since the installation of the AIDC.

**B.  Skin Condition**

In addition to the heart condition outlined above, Plaintiff contends that the Defendants displayed deliberate indifference to his medical needs by failing to properly treat a skin malady that he developed while imprisoned at the ADTC.  In his Complaint, Plaintiff states that he "suffered from severe itching and pain over his entire body."  (Compl. ¶ 107.)  The itching was accompanied by "pimples on his skin," which, when scratched, caused "severe bleeding and scabbing."[7]  (Compl. ¶ 107.)

It appears that the Defendants attempted to treat Plaintiff's skin condition.  Unfortunately, after multiple diagnoses and courses of treatment, those attempts were unsuccessful.  In his Complaint, Plaintiff outlined the various measures taken, stating:

> (1) When he first complained of the condition to Dr. Hochberg on October 27, 2006 – the same month he developed the rash – he was diagnosed with a "full body fungal infection."  (Compl. ¶ 108.)  At the time, Dr. Hochberg "prescribed Benadryl, Hydrocortisone, and Lubriderm."  (Compl. ¶ 108.)

---

[7] The Court doubts that the bleeding that resulted from scratching the irritated areas of his skin was "severe" in the common sense of that word, which in the medical context usually denotes conditions that are life-threatening or may result in permanent injury.  While Plaintiff's skin condition was undoubtedly painful, the wounds caused by scratching were almost certainly shallow and his attendant blood loss must therefore have been minimal.  Plaintiff does not contend in his Complaint that he suffered any permanent damage, such as scarring, as a result of those wounds.

(2) When the condition did not subside after two months, Plaintiff was taken to St. Francis, where he underwent a series of tests for scabies.  According to his Complaint, "at least two of the tests came back negative."  (Compl. ¶ 109.) Following the tests, "Plaintiff was given triamcinolone cream, but not nearly enough for his entire body."  (Compl. ¶ 109.)

(3) That same month, Plaintiff complained to Virginia Gorman, a nurse at ADTC, that his skin condition had not been cured.  He was examined by both Ms. Gorman and Dr. Hochberg, who noted that he had an "entire body rash." (Compl. ¶ 110.)  On December 6, 2006, Dr. Hochberg prescribed triamcinolone acetonide to treat the condition.  (Compl. ¶ 110.)  Once again, Plaintiff contends that he was not given enough of that substance to cover his entire body.  (Compl. ¶ 110.)

(4) Nine days later, on December 14, 2006, Plaintiff was once again examined by Dr. Hochberg, who indicated that his condition was likely the result of contact dermatitis.

(5) In another examination on January 13 or 14, 2007 – the fifth relating to his skin condition – Dr. Hochberg reiterated his diagnosis of contact dermatitis and prescribed Prednazone.

(6) On February 1, 2007, Plaintiff once again visited the ADTC infirmary.  He was examined by a nurse and given two tubes of hydroxyzine.  Plaintiff states in his Complaint that the medicine was "did nothing to alleviate Plaintiff's condition, and was a grossly inadequate amount even if it would have helped."

(7) Two weeks later, on February 15, 2007, Plaintiff was examined by yet another ADTC nurse, to whom he complained that the amount of medicine he had been prescribed was inadequate.  Plaintiff contends that "[a]t that time, he was given a referral to increase the amount of tubes given to him at any given time," but for reasons unspecified in his Complaint, he was never provided with the increased amount.  (Compl. ¶ 116.)

(8) On March 8, 2007, Plaintiff was examined by Dr. Smyczek, who prescribed triamcinolone.  As with the other prescriptions he was issued, Plaintiff contends in his Complaint that the amount of medicine he was given "would only cover a small part of [his] body."  (Compl. ¶ 122.)

(9) On May 1, 2007, Plaintiff was visited by physicians for the Centers for Disease Control ("CDC") and New Jersey Department of Health ("NJDOH"). After examining Plaintiff, those doctors diagnosed him with scabies.  (Compl. ¶ 128.)

13

(10) On July 6, 2007, Plaintiff claims he was "made to take a Premetherin 8 hour treatment again, which failed to alleviate" his condition.[8]  (Compl. ¶ 129.)

(11) Twelve days later, on July 18, 2007, Plaintiff was examined by Ms. Proverbs, an ADTC nurse and Defendant in this action.  (Compl. ¶ 130.)

(12) Plaintiff was examined by Dr. Smyczek three times during September and October, 2007.  After those examinations, Dr. Smyczek diagnosed Plaintiff's condition as exima.  (Compl. ¶ 131-132.)

(13) Dr. Smyczek completed two more examinations of Plaintiff's skin condition on January 2 and 15, 2008.  (Compl. ¶ 135.)

(14) Finally, on March 25, 2008, Dr. Smyczek completed another examination of Plaintiff's condition.  At that time, Plaintiff was diagnosed with psoriasis and prescribed "a charcoal-based hair shampoo."  Plaintiff asserts in his Complaint that Dr. Smyczek provided "no further treatment for the rest of Plaintiff's body."  (Compl. ¶ 137.)

Thus, Plaintiff states in his Complaint that, during the roughly 17 months between October 27, 2006 and March 25, 2008, he was examined and treated by medical personnel on 18 different occasions.  His treatment included diagnostic tests provided by St. Francis and various prescriptions aimed at combating his skin condition.  It was provided by five different doctors – including specialists from St. Francis, the CDC, and NJDOH – and no fewer than four different nurses.

Despite those efforts, Plaintiff claims that he was not provided with adequate medical care and continued to suffer from the skin condition for the duration of his time at ADTC. (Compl. ¶ 138.)  During the period between October 26, 2006 and March 25, 2008, he sent numerous complaints to ADTC and CMS officials.  See (Compl. ¶¶ 113, 117-120, 123, 125-27, 133-34, 136.)  Despite the fact that he allegedly continued to suffer from the skin condition until his release on January 3, 2009, however, Plaintiff does not allege that he continued to submit

---

[8] Plaintiff's Complaint includes no information on the previous "Premetherin 8 hour treatment" that he apparently underwent.  Given the phrasing of his Complaint, however, the Court assumes that such a treatment took place at some point prior to July 18, 2007.

requests for medical treatment after March 25, 2008.  Nor does he include any information on

whether his skin condition was effectively diagnosed and treated after his release from ADTC.

## C. Secondhand Smoke

As a third area in which ADTC and CMS officials allegedly acted with deliberate

indifference to his medical needs, Plaintiff claims that he was exposed to significant amounts of

secondhand smoke while incarcerated at ADTC.  The essential element of his claim to that effect

is that from February 6, 2006 to April 10, 2007 he was assigned cells that were located near one

of that facility's bathrooms, where "numerous inmates would smoke."  (Compl. ¶¶ 98, 100-101.)

Plaintiff does not indicate in his Complaint that he notified ADTC personnel of that circumstance

until February 23, 2007, when he informed Defendant Grace Rogers, the Administrator of

ADTC.  (Compl. ¶ 102.)

On April 10, 2007, Plaintiff was transferred to a new cell.  Although he claims that he

continued to be exposed to "significant amounts" of secondhand smoke, Plaintiff's Complaint

does not include any allegation that his new cell was located near one of the ADTC's bathrooms.

(Compl. ¶ 103.)  Nonetheless, Plaintiff requested on October 6 and 10, 2007 that he be moved to

a medical dormitory.  That request was forwarded to Dr. Smyczek, who determined that such a

move was not medically necessary.  (Compl. ¶ 104.)  Despite his long history of filing repeated

complaints, Plaintiff does not allege that he disputed that decision with any higher authority.

During medical examinations performed by Dr. Smyczek on January 14 and 15, 2008,

Plaintiff alleges that he requested a blood toxicology test be performed in order to determine

whether his exposure to secondhand smoke was having a deleterious effect on his health.

(Compl. ¶ 105.)  Dr. Smyczek refused.  Two weeks later, on January 30, 2008, Plaintiff

submitted a request for such a test to ADTC authorities.  That request was denied on February

14, 2008.  Plaintiff pursued an appeal within the facility's administrative channels, which was

denied on March 5, 2008.  (Compl. ¶ 106.)  Despite the fact that Plaintiff was incarcerated at

ADTC for an additional 10 months – from March 5, 2008 until January 3, 2009 – it appears that

he did not submit any further complaints relating to secondhand smoke during his time at ADTC.

**D.  Causes of Action**

Based on the factual allegations set forth above, Plaintiff's Complaint asserts three counts

against Defendants – two pursuant to 42 U.S.C. § 1983 for violations of his Eighth and

Fourteenth Amendment rights to reasonable medical care, and the third for common law

intentional infliction of emotional distress.  The first of Plaintiff's § 1983 claims, which is

asserted against all Defendants, argues that the Defendants acted with deliberate indifference to

his medical needs.  The second asserts that the NJDOC and CMS maintained policies and

practices that allowed those violations to occur, and "failed to act affirmatively when the need to

take action to control [their] agents was obvious."  (Compl. ¶ 150.)  The intentional infliction of

emotional distress claim, which like the first § 1983 claim is asserted against all Defendants,

alleges that "Defendants' conduct was outrageous in failing to provide adequate medical

treatment."  (Compl. ¶ 155.)

## II.  DISCUSSION

In the pending Motion to Dismiss, Defendants argue that Plaintiff's factual allegations

fail to demonstrate that they acted with deliberate indifference to his medical needs.  Therefore,

they contend that no violation of Plaintiff's Eighth or Fourteenth Amendment rights occurred,

and his § 1983 claims must be dismissed with prejudice.  In the alternative, Defendants argue

that Plaintiff's second cause of action – which asserts that the NJDOC and CMS established a

custom or practice that led to the violation of his rights – must be dismissed because he has alleged no facts tending to show such a custom or practice.

For the reasons set forth below, the Court finds that Plaintiff's factual allegations demonstrate that the Defendants did not act with deliberate indifference to his medical needs, and that their actions were not "outrageous," as is required to sustain a cause of action for intentional infliction of emotional distress.  Buckley v. Trenton Saving Fund Soc., 544 A.2d 857, 863 (N.J. 1988) (Under New Jersey law, an intentional infliction of emotional distress claim must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.").  Therefore, Plaintiff's § 1983 and intentional infliction of emotional distress claims must be dismissed.  Because that dismissal is based on the facts alleged by Plaintiff – which he has had an opportunity to amend on two different occasions – rather than any insufficiency in the detail of his pleadings, any further amendment of the Complaint would be futile.  Accordingly, Plaintiff's claims will be dismissed with prejudice.  See In re Burlington Coat Factory Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (stating that a claim may be dismissed with prejudice if amending the complaint would be futile).  Any future suits based on the same alleged violations will be barred under the doctrine of res judicata.[9]  In re Continental Airlines, Inc., 279 F.3d 226, 232 (3d Cir. 2002) ("[A] judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.").

---

[9] On December 21, 2009, Plaintiff filed a Complaint against various Defendants in this action based on the same factual allegations.  See Davidson v. Hayman, civ. no. 09-6424 (DRD).  Because today's ruling has the res judicata of barring Plaintiff's claims in that action, the Court will enter an Order dismissing that suit with prejudice.

**A.  Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted.  When considering a Rule 12(b)(6) motion, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Morse, 132 F.3d at 906.  The court's inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims."  In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the Rule 12(b)(6) standard in two cases: Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007).  The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief."  In contrast, Bell Atlantic, 550 U.S. at 545, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Thus, the assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," id. at 570, meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged."  Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949.  Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950.  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

**B.  "Deliberate Indifference" Standard**

In order to state a cognizable claim under 42 U.S.C. § 1983 for denial of Eighth and Fourteenth Amendment rights to reasonable medical care, a prisoner must allege more than mere negligence on the part of the individuals responsible for his or her medical care.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. 97, 106 (1976).  "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment." Id.  To the contrary, a prisoner asserting a § 1983 claim for denial of medical care "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."[10] Id.

"To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." Giles v. Kearney, 571 F.3d 318, 328 (3d Cir. 2009) (citing Estelle, 429 U.S. at 104-05 (1976)).  That standard requires "subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive

---

[10] Defendants do not dispute that Plaintiff's medical needs were serious.

risk" to an inmate's health and consciously disregard that risk in order to be held liable.  Beers-

Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer v. Brennan, 511 U.S. 825,

837-38 (1994)).  "[A]n inadvertent failure to provide adequate medical care cannot be said to

constitute" deliberate indifference.  Estelle, 429 U.S. at 105-06.  While prison officials may be

held liable for "intentionally denying or delaying access to medical care," id. at 104, "prison

officials who actually knew of a substantial risk to inmate health or safety may be found free

from liability if they responded reasonably to the risk, even if the harm ultimately was not

averted."  Farmer, 511 U.S. at 844.

     "Where a prisoner has received some medical attention and the dispute is over the

adequacy of the treatment, federal courts are generally reluctant to second guess medical

judgments and to constitutionalize claims which sound in state tort law."  United States ex. rel

Walker v. Fayette County, Pa., 599 F.2d 573, 575 n.2 (3d Cir. 1979).  "[P]rison authorities are

afforded considerable latitude in the diagnosis and treatment of prisoners."  Durmer v. O'Carroll,

991 F.2d 64, 67 (3d Cir. 1993).  "There may … be several ways to treat an illness," and the

decision of a prisoner's physicians to opt for one reasonable method over another does not give

rise to an Eighth Amendment claim.  White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).  A

medical decision not to order specific diagnostic tests is "a classic example of a matter for

medical judgment," and cannot form the basis for a claim of deliberate indifference.  Estelle, 429

U.S. at 107 (discussing physician's decision not to conduct an x-ray on a prisoner who had

suffered a back injury).  Similarly, the Court of Appeals for the Third Circuit has ruled that

refusal to provide a given drug or method of treatment does not constitute deliberate

indifference.  Walker, 599 F.2d at 575 (discussing refusal of prison authorities to provide

methadone to an inmate undergoing withdrawal from heroin despite the fact that inmate

displayed symptoms over a period of ten days and requested the former drug).

## C. Plaintiff's Claims

Under that standard, Plaintiff's claim that Defendants acted with deliberate indifference

to his medical needs must fail.  Plaintiff's own allegations demonstrate that physicians at ADTC

monitored his heart and skin conditions on an ongoing basis throughout his incarceration at that

facility.  He was examined by at least five different doctors – including specialists from St.

Francis, the CDC, and NJDOH – on more than 20 occasions.  Non-medical prison officials met

with Plaintiff several times to address his complaints, and he was under almost constant care

from the ADTC nursing staff.  When he complained of severe chest pains on July 26, 2006, the

medical staff at ADTC responded quickly, transferring him to St. Francis where he underwent an

emergency angioplasty surgery that almost certainly saved his life.

Plaintiff contends throughout his Complaint that the Defendant physicians should have

acted differently.  He claims (1) that his heart condition made it inappropriate for him to be

assigned a top bunk, (2) that his doctors should have noticed the blockages in his arteries and

provided an emergency angioplasty sooner, (3) an AICD should have been installed immediately

after his angioplasty surgery when it was recommended by one of the physicians at St. Francis

that he receive such a device, and (4) that his AICD should have been replaced after he was

informed by Medtronic that it was defective.  Those assertions are, in essence, allegations that

the Defendants acted negligently or committed medical malpractice, and cannot form the basis of

a claim for deliberate indifference.  See Estelle, 429 U.S. at 106 ("[A] complaint that a physician

has been negligent in diagnosing or treating a medical condition does not state a valid claim of

medical mistreatment.").  Whether Plaintiff's heart condition made it dangerous for him to be

assigned a top bunk or work in the ADTC kitchens is a medical question best left to the good judgment of his doctors. Durmer, 991 F.2d at 67 ("[P]rison authorities are afforded considerable latitude in the diagnosis and treatment of prisoners."). The failure of his doctors to diagnose blockages in his arteries prior to July 26, 2006, when such a diagnosis was made and Plaintiff was provided with an emergency surgery to correct the condition, may constitute negligence, but does not rise to the level of deliberate indifference. Estelle, 429 U.S. at 105-06 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute" deliberate indifference.). The decision by ADTC physicians to monitor Plaintiff's recovery from his angioplasty surgery and delay installing an AICD – despite the fact that at least one doctor at St. Francis recommended that such a device be installed, see (Compl. ¶ 51) – did not constitute deliberate indifference, as it was within the discretion of those doctors to seek a reasonable alternative means of treatment. White v. Napoleon, 897 F.2d at110 ("[N]o claim is stated when a doctor disagrees with the professional judgment of another doctor. There may … be several acceptable ways to treat an illness."). For the same reason, Plaintiff's contention that his AICD should have been replaced cannot form the basis of an Eighth Amendment claim. Whether the defects in that device justified the risk of putting Plaintiff through another surgery is a medical question, and Plaintiff's disagreement with his doctors on that point does not transform their judgment into deliberate indifference to his medical needs. Id. ("[A] plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment."). Therefore, to the extent that Plaintiff's § 1983 claims are based on his heart condition, those claims must be dismissed with prejudice.

Similarly, Plaintiff's allegations relating to his skin condition demonstrate that the Defendants did not act with deliberate indifference. That condition was examined by multiple

physicians who, apparently baffled by his symptoms, attempted various forms of treatment. While those attempts were ultimately unsuccessful, Plaintiff's factual allegations support the conclusion that they were undertaken in good faith. Plaintiff complains that his doctors did not prescribe sufficient amounts of medication, takes issue with the effectiveness of the medication that was prescribed, and argues that his physicians should have run further diagnostic tests in order to determine the nature of his skin condition. As discussed above, however, In light of those allegations, Plaintiff's Second Amended Complaint demonstrates that the Defendants did not act with deliberate indifference to his serious medical needs, and his claims to that effect must be dismissed with prejudice.

Plaintiff's allegations that he was exposed to secondhand smoke are also insufficient to state a constitutional claim. He alleges that one of his treating physicians, Dr. Smyczek, determined that a transfer from his cell in the ADTC general population to that facility's medical infirmary was not necessary. (Compl. ¶ 104.) While Plaintiff may disagree with that judgment, such disagreement cannot form the basis for an Eighth Amendment claim, as the question of whether Plaintiff's health required that he be transferred was a "classic example of a matter for medical judgment." Estelle, 429 U.S. at 107. Therefore, the § 1983 claim contained in the first count of Plaintiff's Complaint, in which he contends that Defendants acted with deliberate indifference to his serious medical needs, will be dismissed with prejudice.

In light of that ruling, the second count of Plaintiff's Complaint – in which he alleges that CMS and the NJDOC maintained policies and practices that allowed those violations to occur, and "failed to act affirmatively when the need to take action to control [their] agents was obvious," (Compl. ¶ 150) – must also be dismissed. Because Plaintiff's factual allegations demonstrate that Defendants did not act with deliberate indifference, he cannot prove a violation

of his Eighth and Fourteenth Amendment rights to reasonable medical care while incarcerated. Estelle, 429 U.S. at 106. In the absence of such a violation, the policies or customs promulgated by CMS and the NJDOC are irrelevant – those entities simply cannot be held liable under an agency theory for violations which did not occur. Therefore, Plaintiff's second § 1983 claim, which is contained in the second count of his Complaint, will be dismissed with prejudice.

Plaintiff's intentional infliction of emotional distress claim must also be dismissed. In order to sustain such a cause of action, a Plaintiff must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Buckley, 544 A.2d at 863. Additionally, "the emotional distress suffered by the plaintiff must be so severe that no reasonable man could be expected to endure it." Id. (internal quotations omitted). Plaintiff's Complaint contains no allegations as to the severity of his emotional distress. Therefore, he has failed to meet the second requirement. Moreover, the actions of the Defendants in this case, as alleged in Plaintiff's Complaint, do not rise to the level of "outrageousness" necessary to sustain an intentional infliction of emotional distress claim. As discussed above, Plaintiff's own factual assertions demonstrate that the Defendants attempted in good faith, although with mixed success, to treat his various maladies. Those attempts included more than 20 examinations by at least five different doctors and nurses over a period of approximately two years, an emergency angioplasty surgery that likely saved Plaintiff's life, the installation of an AICD, consultations with the CDC and NJDOH relating to Plaintiff's skin condition, and diagnostic tests to identify that condition at St. Francis. While Plaintiff may disagree with the manner in which he was treated, that disagreement does not transform the Defendants' actions into the sort of "outrageous" behavior

24

necessary to sustain his claim.  Therefore, the third count of Plaintiff's Complaint will be dismissed with prejudice.

### III.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is granted, and Plaintiff's Second Amended Complaint is dismissed with prejudice in its entirety.

The Court will enter an Order implementing this Opinion.




  **s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated:  January 19, 2010